**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| MOREY L. MARCUS, | : | Civil No. 04-4862 (JLL) |
| Petitioner, | : |  |
| v. | : | **O P I N I O N** |
| ROY L. HENDRICKS, et al., | : |  |
| Respondents. | : |  |

**APPEARANCES:**

Morey L. Marcus, Pro Se
#251967 2A/141827A
New Jersey State Prison
CN 861
Trenton, NJ 08625-0861

Catherine Antoine Foddai
Assistant Prosecutor
Bergen County Prosecutor's Office
Bergen County Justice Center
Hackensack, NJ 07601
Attorney for Respondents

**LINARES, District Judge**

   Petitioner, Morey L. Marcus, filed the within petition for a Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254. Respondents have filed an Answer. The Court has considered all submissions. For the reasons set forth below, the Petition will be denied.

**BACKGROUND**

1.  <u>Factual Background</u>

The facts of this case were recounted below and this Court, affording the state court's factual determinations the appropriate deference, see 28 U.S.C. § 2254(e)(1), will simply reproduce the Appellate Division's factual recitation:

> The crimes were committed in Rutherford during the early morning hours of December 28, 1989, after defendant and the victim had been seen drinking together in several local bars. Defendant and the victim were seen leaving the last of these bars around 3 a.m. Approximately an hour later, the victim staggered into an all-night gasoline station, completely naked and covered with blood. After asking the persons in the station and the police who arrived shortly thereafter for help, the victim fell unconscious and later died in the hospital. An autopsy revealed that the cause of her death was multiple stab wounds to the neck, chest and legs.
>
> Within a few minutes after the victim walked into the gasoline station, a police officer responding to the scene observed defendant's van parked nearby with its lights on and its side passenger door open. When the officer paused to ask defendant what he was doing, defendant said he was on his way to work but had stopped to urinate. After writing down the van's license plate number, the officer proceeded to the gasoline station. A tow truck operator at the gasoline station later informed the officer that he had seen a van, with its side passenger door open, go through a stop sign at an intersection near the gasoline station around the same time that the victim arrived there mortally wounded. The police later found a dress, purse, sweater, coat and jewelry belonging to the victim in the same vicinity where defendant's van had been parked, and at trial defendant admitted discarding these items at that location.
>
> The police investigation of the crime scene revealed a trail of the victim's bloody footprints in snow that had fallen earlier that evening, which ran a

distance of three or four blocks to a point of origin. At this location, the police observed a large pool of blood, boot prints which roughly matched the size of boots later seized from defendant, and tire tracks.

Approximately a half hour after the local police officer's observation of defendant near the murder scene, defendant was apprehended for drunk driving by two New Jersey State troopers.  The troopers made a cursory inspection of the interior of the van and noticed a hunting knife and female high heel shoes. One of the troopers also noticed dried blood on defendant's knuckles and forehead as well as the top of his right boot.  At trial, defendant acknowledged that he threw the victim's high heel shoes into a vacant lot after retrieving his van from the State Police.

The police were unable to find the knife used to inflict the stab wounds upon the victim.  However, the police found an empty knife sheath inside defendant's van that could have been used to carry the type of knife that caused the wounds.  The police also found blood stains all over the inside of the van.  Serology tests definitively determined that the bloodstains could not have come from defendant but that the victim could have been the source.

Defendant was arrested less than twenty-four hours after the crime and questioned by the police. Defendant initially claimed that he had left the victim in the parking lot of a bar at approximately 3 a.m. and then drove away.  However, after the police confronted defendant with the fact that an officer had seen him near the scene of the crime shortly after 4 a.m., defendant changed his story and asserted that he had driven the victim to a secluded spot after she agreed to have sex with him.  According to defendant, the victim undressed and got into the back of his van, but suddenly began acting erratically, first yelling and screaming, and then attempting to stab him with a knife she apparently had taken out of her purse.  Defendant asserted that after briefly struggling with him, the victim left the van and headed in the direction of the gas station, naked but unharmed.  Although defendant at first denied stabbing the victim, after further police interrogation he said that he could not remember stabbing her but that "it's possible."

3

> At trial, the State also presented DNA evidence through experts who testified that the DNA print patterns of bloodstains found on a pair of defendant's blue jeans seized from his bedroom matched those of the victim and that defendant's blood could not possibly have been the source of these bloodstains. Defendant responded with experts who challenged the methodology of the State's DNA testing and the results it produced.

See State v. Marcus, 294 N.J. Super. 267, 271-273 (App. Div. 1996).

2.  Procedural History

On March 27, 1990, a Bergen County Grand Jury indicted Petitioner on three counts, including: first degree murder, contrary to N.J.S.A. 2C:11-3a(1) and (2) (count one); first degree felony murder, contrary to N.J.S.A. 2C:11-3a(3) (count two); and first degree attempted aggravated sexual assault, contrary to N.J.S.A. 2C:5-1 and N.J.S.A. 2C:14-2a(3) and (4) (count three).

Between June 15, 1992 and November 10, 1992, a pretrial hearing pursuant to Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), was held before the trial court to determine the admissibility of DNA test results at trial. On December 23, 1992, the trial court found that the DNA test results were admissible.

From January 11 through March 11, 1993, Petitioner was tried by jury in Superior Court of New Jersey, Law Division, Bergen County ("Law Division"). The jury found the petitioner guilty on all three counts of the indictment.

4

On April 27, 1993, Petitioner was sentenced a life sentence, with 30 years of parole ineligibility, plus ten years.

Petitioner appealed his conviction and sentence. The Superior Court of New Jersey, Appellate Division ("Appellate Division"), affirmed both on October 17, 1996 in a published opinion, State v. Marcus, 294 N.J. Super. 267 (App. Div. 1996).

Petitioner filed a petition for certification with the New Jersey Supreme Court. The petition was denied on November 18, 1998.

Petitioner filed a petition for post-conviction relief ("PCR") in the Law Division in 1998. On July 27, 2001, the petition was denied. On June 9, 2003, the Appellate Division affirmed the denial of the PCR petition. On October 2, 2003, Petitioner's petition for certification to the New Jersey Supreme Court was denied.

The instant petition was filed on October 26, 2004. On December 1, 2004, Petitioner was advised of his rights pursuant to Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000). On March 21, 2005, Respondents filed an Answer and the state court record.

### DISCUSSION

**A.   Petitioner's Claims.**

Petitioner asserts the following arguments for habeas relief:

1. The DNA evidence and testimony in this case should not have been admitted because neither the procedure used

5

        by Lifecodes, nor the results obtained thereof, particularly as to matches and the statistical interpretation of same, have been generally accepted as reliable in the scientific community.

2.   The exclusion by the trial court of statements made by the victim while she was involuntarily committed at Bergen Pines Hospital that she "had the nerve to kill herself," and also that she wished "to destroy" her boyfriend's car with a hammer, was prejudicial to the defense and compromised the defendant's right to a fair trial in that the defendant's version of the alleged incident would have been supported by said testimony.

3.   It was inappropriate for the trial judge to respond to the jury's questions as to the applicability of the death penalty in this case, to the effect that it did not apply, because punishment is not within the jury's province, and any instruction concerning the same tends to diminish the presumption of innocence.

See Petition for Writ of Habeas Corpus, ¶ 15 (pp. 5-8).

Petitioner has raised the instant claims before the New Jersey state courts.

## B.   Standards Governing Petitioner's Claims.

Section 2254 of Title 28, United States Code, provides that the district court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

Under 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), federal courts in habeas corpus cases must give considerable deference to determinations of the state trial and appellate courts. See

Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied 534 U.S. 919 (2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996)(citing Parke v. Raley, 506 U.S. 20, 36 (1992)).

Section 2254(d) sets the standard for granting or denying a writ of habeas corpus. The statute reads as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 412-13 (2000), the Supreme Court explained the application of § 2254(d)(1). The Court analyzed subsection 1 as two clauses: the "contrary to" clause and the "unreasonable application" clause. The Court held that under the "contrary to" clause, "a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. A federal court may grant the writ under the "unreasonable

7

application" clause, if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  Habeas relief may not be granted under the "unreasonable application" clause unless a state court's application of clearly established federal law was objectively unreasonable; an incorrect application of federal law alone is not sufficient to warrant habeas relief.  See id. at 411; see also Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000), cert. denied, 532 U.S. 980 (2001); Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 891 (3d Cir.), cert. denied, Matteo v. Brennan, 528 U.S. 824 (1999).  Thus, the federal court must decide whether the state court's application of federal law, when evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent.  See Werts, 228 F.3d at 197; see also Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005).

   With regard to 28 U.S.C. § 2254(d)(2), a federal court must confine its examination to evidence in the record.  See Abu-Jamal v. Horn, 2001 WL 1609690, at *12 (E.D. Pa. December 18, 2001). In addition, the state court record should be reviewed to assess the reasonableness of the state court's factual determinations. See id.  Finally, federal courts are required to apply a "presumption of correctness to factual determinations made by the

state court." Id.; see also 28 U.S.C. § 2254(e)(1).  The Court of Appeals for the Third Circuit has ruled that this presumption of correctness can be overcome only by clear and convincing evidence.  See Duncan v. Morton, 256 F.3d 189, 196 (3d Cir. 2001)(citing 28 U.S.C. § 2254(e)(1)).  "A finding that is well-supported and subject to the presumption of correctness is not unreasonable."  Abu-Jamal, 2001 WL 1609690 at *12 (citing Duncan, 156 F.3d at 198).

Furthermore, federal habeas courts ordinarily refrain from revisiting credibility determinations as "it would be wholly inappropriate for a federal court to repastinate soil already thoroughly plowed and delve into the veracity of the witnesses on habeas review."  Sanna v. Dipaolo, 265 F.3d 1, 10 (1st Cir. 2001).  A habeas petitioner therefore "must clear a high hurdle before a federal court will set aside any of the state court's factual findings."  Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001).

A pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United

States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

**C.     Petitioner's Claims Regarding DNA Evidence (Ground 1).**

Petitioner argues that the State introduced evidence at his trial concerning DNA found in blood from Petitioner's pants and DNA found in blood from the victim's shirt. The report concluded that the chance of anyone other than the victim having been the source of the blood on Petitioner's pants was 1 in 5 billion.

The trial court held a 28-day hearing with respect to the admissibility of the DNA evidence, pursuant to Frye v. United States, 293 F. 1013 (D.C. Cir. 1923). (See Respondents' Exhibits, "RE" 16-46). On December 23, 1992, the trial judge rendered his decision on the DNA evidence in an oral opinion. (RE 47). The trial judge held:

> Now, the issue raised by the defense is whether the State has sufficiently demonstrated to this Court that the determination of a match's statistical significance has received general scientific acceptance. The defense has amply demonstrated that there is currently a fundamental disagreement among population geneticists as to the statistical significance if [sic] a match of DNA pattern.
>
> ***
> ... The calculation of a statistical probability is an integral part of the process and the underlying methods of arriving at that calculation must pass muster under the Frye rule. It cannot be excluded. The statistical calculation step is referred to as a pivotal element of the DNA analysis, for the evidence means nothing without a determination of the statistical significance of a match of the DNA patterns.

10

>    Now, the State has presented expert testimony that the commonly relied upon method used to calculate necessary statistical probabilities was used, and that is known as the Product Rule.  It is used to calculate the probability that a number of events will occur simultaneously.  The probability of each event occurring separately are multiplied.
>
>    Now, this Product Rule is an accepted and reliable method of calculating statistical probabilities in the DNA identification process.  I find that precise adherence to proper and accepted procedures was achieved in this case, and therefore reliable results were attained.
>
>    In conclusion, it is the finding of this Court that the State has satisfied its burden of proof of the general acceptance and reliability of DNA evidence.  The theory of forensic DNA printing has gained acceptance in the scientific community. [Indecipherable]. . . .  Lifecodes probability calculations was [sic] presented by expert testimony at the hearings and satisfies the requisite standards of general acceptance and reliability.
>
>    Therefore, the State has clearly and convincingly proven that DNA evidence in this case is admissible in this criminal trial insofar as Lifecodes substantially performed scientifically acceptable tests, thereby obtaining significantly reliable results within a reasonable degree of scientific certainty.
>
>    The defense has successfully raised the fact that there is controversy in the field.  But I do not find that the State's evidence in this case in any way is unreliable because of the existing controversy.  Therefore, this Court shall permit the evidence to be presented by the State, if it wishes.

(RE 47 at pp. 8-11).

The Appellate Division discussed this issue at length in its published decision affirming the conviction.  See State v. Marcus, 294 N.J. Super. 267, 274-291 (App. Div. 1996).  The Appellate Division noted that at trial, the defense was permitted

11

to present evidence regarding the reliability of the DNA evidence, and held that:

> . . . any dispute regarding the statistical significance of matching DNA profiles does not affect the general acceptance of DNA analysis within the scientific community and consequently should not result in the exclusion of such evidence in criminal trials. We also conclude that the State made a sufficient showing of the scientific reliability of Lifecodes' procedures and the results of its tests upon the bloodstain evidence involved in this case to justify the admission of those results.

Marcus, 294 N.J. Super. at 291.

It has been held that federal courts must afford the states deference in their determinations regarding evidence and procedure. See Crane v. Kentucky, 476 U.S. 683, 690 (1986)(stating "we have never questioned the power of the States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability, even if the defendant would prefer to see that evidence admitted"). It is well-established that "a state court's misapplication of its own law does not generally raise a constitutional claim. The federal courts have no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997)(citations omitted), cert. denied, 522 U.S. 1109 (1998).

Assuming, arguendo, that the trial judge did err under state law in admitting the DNA evidence, a state's misapplication of

12

its own law may constitute a violation of due process only in "rare" cases.  See id. ("when that misapplication has the effect of depriving a person of life, liberty, or property without due process of law in violation of the Fourteenth Amendment, the resulting federal constitutional error can be corrected by a federal habeas court").  Evidentiary rulings may violate due process when the petitioner "was denied fundamental fairness at trial."  Hutchins v. Hundley, 1991 WL 167036 at *4 (D.N.J. Aug. 22, 1991)(Wolin, J.)(citations omitted); see also Kontakis v. Beyer, 19 F.3d 110, 120 (3d Cir.), cert. denied, 513 U.S. 881 (1994); Lisenba v. California, 314 U.S. 219, 228, 236 (1941)(holding that state court's evidentiary rulings may form the basis for habeas relief when they "so infused the trial with unfairness as to deny due process of law").

    The appropriate inquiry is "whether the claimed error of law is a fundamental defect which inherently results in a complete miscarriage of justice or in an omission inconsistent with the rudimentary demands of fair procedure."  Hutchins, 1991 WL 167036 at *4 (citing United States v. De Luca, 889 F.2d 503, 506 (3d Cir. 1989), cert. denied, 496 U.S. 939 (1990))(other citations omitted).  The Supreme Court has further stated that "an otherwise valid conviction should not be set aside if the reviewing court may confidently say on the whole record that the constitutional error was harmless beyond a reasonable doubt."

13

Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986).  An error is not harmless if "it aborts the basic trial process or denies it altogether."  Hutchins, 1991 WL 167036 at *5 (citing Rose v. Clark, 478 U.S. 570, 578 n.6 (1986)).

In the instant case, this Court finds that Petitioner's case is not the "rare" instance where evidentiary rulings have violated his rights to due process.  A review of the whole record demonstrates that the trial process was fundamentally fair.  Petitioner's counsel was present for the 28-day Frye hearing and was available to cross-examine and present evidence regarding the reliability of the DNA evidence.  Also, during trial Petitioner's counsel presented evidence regarding the reliability of the DNA to the jury.  The jury was able to weigh the State's presentation of witnesses regarding DNA reliability with the Petitioner's witnesses and utilize that in its deliberations.

Nonetheless, even if the trial court's admission of the DNA evidence was in error, there was sufficient evidence to find Petitioner guilty.  Evidence presented at trial included Petitioner's own admission that he was with the victim that night, that the victim was in his van, that the victim struggled with him, that it was "possible" that he stabbed the victim, that he discarded the victim's clothing and belongings.  Other evidence included the boot prints in blood which roughly matched Petitioner's boots, and tire tracks, and the presence of a knife

sheath that could have contained a knife like that used to kill the victim.  Further evidence included the identification of Petitioner's van near the murder scene, and Petitioner's presence near the murder scene.  Thus, Petitioner's due process rights were not violated, as his trial was fundamentally fair.

Thus, Petitioner has not shown, as required by 28 U.S.C. § 2254(d), that the state court determinations have "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Accordingly, this ground for a writ of habeas corpus will be denied.

D.   **Petitioner's Claim Regarding Exclusion of Victim's Statements (Ground 2).**

Petitioner argues that the trial court erred in excluding certain statements made by the victim to a doctor at a hospital as hearsay.  In particular, a doctor's report concerning the victim from the hospital contained the quotes "I have the nerve to kill myself," and "I wanted to break my boyfriend's car with a hammer," as well as "I will go back to Connecticut to live with my father.  I'll seek help for myself in Connecticut."  The trial court heard arguments concerning the admissibility of the statements outside the presence of the jury.  The trial court

15

found that the statements were hearsay and would not permit the witness to testify as to the statements. (RE 77 at pp. 10-17). Petitioner contends that the statements would have supported his version of the alleged incident.

The Appellate Division examined this claim in Petitioner's direct appeal and held that it was "clearly without merit" and did not warrant discussion. See Marcus, 294 N.J. Super. at 274.

As discussed in this Court's Opinion, Section C, above, state court evidentiary rulings may violate due process where Petitioner was denied fundamental fairness at trial. In this case, Petitioner has not demonstrated that his trial was fundamentally unfair, or that the exclusion of the hearsay evidence was not harmless error. In fact, Petitioner presented numerous witnesses at trial in support of his defense. That the statements found to be hearsay were not admitted did not diminish the Petitioner's case, as evidence was admitted at trial regarding the victim's mental state and actions. In fact, one officer described the victim as "very abusive," stating that she was "screaming, yelling, belligerent" and "very wild" and "combative." (RE 72 at pp. 77-79). Another officer testified that he responded to a call that the victim was going to kill herself. (RE 73 at pp. 15-16). Therefore, Petitioner has not demonstrated that his due process rights were denied by the exclusion of the statements in the hospital report.

Further, Petitioner has not shown, as required by 28 U.S.C. § 2254(d), that the actions of the state courts "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  This ground for a writ of habeas corpus, is therefore denied.

**E.     Petitioner's Claim Regarding Jury Question (Ground 3).**

During deliberations, the jury sent a question to the judge: "The panel wishes to know if a death penalty can be applied in this case?"  The trial judge responded to the jury:

> The answer to that question is no.  If a death penalty was to be applied in the case, you would have known that from the very first of this trial.  The death penalty is not part of this case, nor is it contemplated or even – its just not part of the case.  It cannot be applied.
>
> That answers your question.  That's it.  Thank you.  Return to your deliberations.

(RE 79, p. 75).  An hour later, the jury returned with a guilty verdict on all three counts of the indictment.  Petitioner argues that the trial judge's response diminished the presumption of innocence.

The Appellate Division examined this issue in Petitioner's direct appeal.  The Appellate Division stated:

17

> We are satisfied that the court's response to the jury's question was appropriate. Given the gruesome nature of the crime, the fact that the case took nearly three months to try, the complexity of much of the testimony, and the number of experts who testified, it is not surprising that the jury wondered whether the death penalty was involved. The court simply provided the jury with a direct and accurate response to this question. We see no basis for concluding that the jury's verdict was improperly influenced by its knowledge that the death penalty could not be imposed upon defendant.

See Marcus, 294 N.J. Super. at 234.

When the jury requests clarification of the charge, the trial judge must "clear away the confusion." Grecco v. O'Lone, 661 F. Supp. 408, 413 (D.N.J. 1987)(citing United States v. McCall, 592 F.2d 1066, 1068 (9th Cir. 1979)). In this case, Petitioner fails to demonstrate how the judge's answer to the jury's question diminished the presumption of innocence. As the Appellate Division stated, the jury most likely was curious whether or not the death penalty was a factor in the case. The trial judge did not offer any statements to the jury regarding the sentencing that Petitioner would or should have received, and did not comment on Petitioner's guilt. The judge simply answered "no," and stated that the jury would have known if the case were a death penalty case.

Further, the jury was charged regarding presumption of innocence during the general jury charge. The trial court advised:

18

> Mr. Marcus, as are all defendants in criminal cases, is presumed innocent until proven guilty beyond a reasonable doubt. I'll explain the meaning of reasonable doubt momentarily. However, I want to impress on you that the defendant is presumed innocent through the entire trial and even during your deliberations unless and until you have determined that the State has proven his guilt beyond a reasonable doubt.

(RE 79 at p. 14). Petitioner has presented nothing to evidence that the jury did not follow this instruction. Thus, the Court finds no violation of Petitioner's due process rights, or any constitutional right, with regard to the trial judge's answer to the question presented by the jury.

Therefore, Petitioner has not shown, as required by 28 U.S.C. § 2254(d), that the actions of the state courts "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." This ground for a writ of habeas corpus, is therefore denied.

## **CONCLUSION**

For the foregoing reasons, the Petition for a Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254 is denied. The Court further finds that no certificate of appealability will issue because Petitioner has not made a substantial showing of the

denial of a constitutional right, as required by 28 U.S.C. § 2253.

An appropriate Order accompanies this Opinion.


                                    /s/ Jose L. Linares
                                    JOSE L. LINARES
                                    United States District Judge

Dated: May 24, 2006